**IT IS ORDERED as set forth below:**

**Date: June 12, 2026**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 25-56553-JWC |
| IRVING RUSSELL, | CHAPTER 7 |
| Debtor. | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Debtor's Notice of Conversion from Chapter 7 to Chapter 13 [Doc. No. 88] (the "Motion to Convert"). Mike Bargar, as chapter 7 trustee ("Trustee"), filed his Response in Opposition to the Motion [Doc. No. 120]. The Court held three hearings on the Motion to Convert, among other matters in this case, on December 18, 2025, February 24, 2026, and April 2, 2026 (the "Hearings"). Counsel for the United States Trustee appeared at the Hearings and joined in Trustee's

1

opposition to the Motion to Convert. Mr. Russell asserts in the Motion to Convert that he has an absolute right to convert to chapter 13, but the Supreme Court has made clear that chapter 7 debtors have no such right in cases of bad faith. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 127 S.Ct. 1105 (2007). The Supreme Court did not "articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7," but it emphasized "that the debtor's conduct must, in fact, be atypical" and limited to "extraordinary cases." *Id.* at 375 n.11. This case fits both descriptions, and the Court will deny the Motion to Convert.

## JURISDICTION

The Court has jurisdiction over the Motion to Convert pursuant to 28 U.S.C. § 1334. The Motion to Convert is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

## FINDINGS OF FACT[1]

### A. Prior Cases

Mr. Russell filed this case June 12, 2025 [Doc. No. 1.], his fifth bankruptcy case and his fourth filed in less than two years. Mr. Russell successfully completed a chapter 13 plan in his first case filed in 1996. [*See* Case No. 96-78531.] His last three cases were less successful. Mr. Russell filed a chapter 13 case June 30, 2023, but the Court dismissed that case in less than three months for failure to fund the plan. [*See*

---

[1] The Court takes judicial notice of the pleadings and filings in this bankruptcy case and Mr. Russell's previous bankruptcy cases. Fed. R. Evid. 201; *Bobadilla v. Aurora Loan Servs.,* 478 Fed. App'x 625, 627 (11th Cir. 2012) (unpublished) ("A court may take judicial notice of its own records and the records of inferior courts." (citing *United States v. Rey,* 811 F.2d 1453, 1457 n.5 (11th Cir.1987))).

2

Case No. 23-56186.] Mr. Russell filed his next case two months later on November 3, 2023. [*See* Case No. 23-60906.] The Court dismissed that case nearly five months later for failure to comply with a direction of the Court. [*Id.* at Doc. No. 26.] A year later Mr. Russell filed his most recent previous case, a chapter 7 case. [*See* Case No. 25-53541.] Mr. Russell filed a skeletal petition, meaning he filed only the bare minimum documents required to open a bankruptcy case. The Court dismissed that case nearly a month later for failure to file required documents and denied a request to reconsider dismissal.[2] Mr. Russell filed this case exactly one month after the Court denied reconsideration.

## B. The Schedules in This Case and Missed 341 Meetings

This case started off rather ordinarily. Mr. Russell filed his petition along with all other papers debtors are required to file with a petition. [*See* Doc. Nos. 1, 2, 4, 5, and 14.] He paid the filing fee in full. His original schedules disclosed a home valued at $550,500 encumbered by a mortgage with a balance of $309,859; an unencumbered car; other personal property such as appliances, electronics, clothing, and jewelry; two bank accounts at Navy Federal Credit Union containing $2,205 total; and one bank account at Wells Fargo containing $2,816. [Doc. No. 1, Sch. A/B.] His Schedule

---

[2] Mr. Russell filed a motion to reconsider dismissal, arguing that he did not receive notice of the Court's order requiring him to file missing documents. [Doc. No. 15, Case No. 25-53541.] The Court denied that request because it did not find Mr. Russell's arguments credible because (1) the Bankruptcy Notice Center served the Court's order to the email address Mr. Russell provided the Court for notice, and (2) his signature appeared on an acknowledgment of receipt of a separate deficiency notice filed with his petition listing the missing documents and the deadline to file the documents and notifying him that the case might be dismissed if he failed to file the documents. [Doc. No. 19, Case No. 25-53541.]

C claimed exemptions in all scheduled property *except* the three bank accounts. [*Id.* at Sch. C.]

Other than the mortgage debt, Mr. Russell scheduled a priority debt to the IRS of $4,263 and general unsecured claims totaling $26,373, which included three credit card debts and a student loan. [*Id.* at Sch. D and E/F.] Schedule I shows that Mr. Russell has been employed as a professor at a local university for 14 years and also receives social security income, VA disability and pension income, and income from another pension or retirement income source. [*Id.* at Sch. I.] Altogether, Mr. Russell scheduled $8,424 of combined monthly income. [*Id.*] Schedule J shows $6,322 in monthly expenses, including monthly payments of $2,162 for his mortgage, and monthly net income of $2,101.08. [*Id.* at Sch. J.]

The initial 341 meeting of creditors was scheduled for July 21, 2025, but Mr. Russell failed to appear. [*See* Doc. Nos. 10 and 16.] The case quickly derailed from there. Trustee rescheduled the 341 meeting for a month later, but Mr. Russell failed to appear again in August, and again in September, and again in October, and again in November. Altogether, Mr. Russell failed to appear at 5 scheduled 341 meetings.[3] His only explanation for these repeated failures to appear was that he received bad advice.

---

[3] *See* Doc Nos. 45, 61, and 76 and a non-numbered docket entry dated November 18, 2025 appearing between Doc. Nos. 80 and 81. Mr. Russell appeared by telephone but not video at the November meeting, and it had to be rescheduled.

### C. The Undisclosed Bank Account

After the first 341 meeting in July, Trustee learned from the United States Trustee's office that Mr. Russell failed to disclose a savings account at Navy Federal Credit Union with a balance of approximately $30,000. Trustee asked Navy Federal to freeze the undisclosed account along with the two accounts at Navy Federal that Mr. Russell did disclose. Wells Fargo also froze the account there that Mr. Russell disclosed in his initial Schedule A/B. The account freezes ignited a firestorm of filings by Mr. Russell.

A few days after the account freezes, Mr. Russell filed amended Schedule A/B to disclose the additional Navy Federal savings account, which he scheduled to hold $27,000. [Doc. No. 19.] He also amended the amounts in the other three accounts to show only $39 in the other two Navy Federal Accounts and only $532 in the Wells Fargo account. [*Id*.] Mr. Russell also filed an amended Schedule C to claim an exemption in all funds in all four accounts pursuant to 42 U.S.C. § 407(a), 38 U.S.C. § 5301(a), and 10 U.S.C. § 1440. [*Id*.]

### D. The First Emergency Motion and Other Filings

A few days after filing the amended schedules, Mr. Russell filed an Emergency Motion for Immediate Release of Exempt Funds and Relief from Trustee's Account Freeze [Doc. No. 23] (the "First Emergency Motion"). The First Emergency Motion asserted that all four accounts contained only exempt funds from Social Security benefits, military retirement pay, and VA disability compensation. The Court

5

scheduled the First Emergency Motion for hearing to be held August 21, 2025, and Trustee filed a response [Doc. No. 32.]

Two days before the scheduled hearing, Mr. Russell filed seven documents.[4] Six of the documents were mostly duplicative and repeatedly asserted that Mr. Russell verified that the sources of the funds in the bank accounts were from exempt sources, that he mistakenly filed chapter 7 without understanding the accounts could be subject to freezing, and making various arguments that he should not be required to appear at any hearing. [*See* Doc. Nos. 34-40.] In at least one document Mr. Russell requested that the case be dismissed without prejudice. [Doc. No. 36.] One of the documents objected to a purported request for 2004 exam by the United States Trustee, asserting that Mr. Russell would not attend a 2004 examination under any circumstance based on principles of equity. [Doc. No. 35.][5] These documents foreshadowed much of what was to come in the case over the next several months.

Mr. Russell did not appear at the August 21 hearing to prosecute his First Emergency Motion. Trustee appeared and explained how he learned about the

---

[4] The seven documents are (1) Supplemental Notice and Demand for Equitable Adjudication Without Physical Appearance [Doc. No. 34]; (2) Verified Objection and Notice of Non-Consent to Rule 2004 Examination [Doc. No. 35]; (3) Verified Motion to Dismiss Chapter 7 Petition Without Prejudice for Equitable Cause and Absence of Administrable Estate [Doc. No. 36]; (4) Verified Emergency Petition for Equitable Ruling Prior to Administrative Proceeding [Doc. No. 37]; (5) Affidavit of Origin of Exempt Funds and Demand for Immediate Restoration [Doc. No. 38]; (6) Verified Notice of Mistaken Filing and Demand for Equitable Limitation of Jurisdiction [Doc. No. 39]; and (7) Verified Rebuttal in Equity to Trustee's Objection and Affirmation of Absolute Exemption Under Acts of Congress and the Constitution [Doc. No. 40].

[5] At the time Mr. Russell filed this document, the United States Trustee had not filed a motion for a 2004 examination, but the document indicated the United States Trustee may have informally requested Mr. Russell to attend a 2004 examination by email.

undisclosed bank account and why he requested a freeze. He also stated that he received a demand and threat of sanctions from Mr. Russell if Trustee did not release the freeze. Trustee requested that the Court deny the First Emergency Motion to allow him to conduct a rescheduled 341 meeting (which was scheduled for the following day) and gather necessary information to evaluate the exemption claims and file an objection pursuant to the Bankruptcy Code and Rules if appropriate. The Court denied the First Emergency Motion because (1) Mr. Russell failed to appear at the hearing to prosecute it and (2) to allow Trustee time to evaluate the claimed exemptions. The Court entered an order denying the First Emergency Motion August 22, 2025. [Doc. No. 44.] That same day, Mr. Russell failed to appear at the first rescheduled 341 meeting. [Doc. No. 45.]

### E. Other Filings and Missed 341 Meetings

A few days later, in early September, Mr. Russell filed a document titled Verified Claim and Demand in Equity for Restoration of Exempt Property, Immediate ADA Access, and Correction of Constructive Dishonor [Doc. No. 51] (the "Verified Claim"). That document argues, among other things, that Trustee's freezing of the bank accounts was unlawful because the funds in the accounts are exempt. The document also acknowledges that Mr. Russell failed to appear at the rescheduled 341 meeting because he "lawfully declined physical presence, having submitted Verified Special Appearance in Equity on record." [Doc. No. 51.] The Verified Claim demands, among other things, the immediate release of the frozen accounts. The Court scheduled the Verified Claim for a hearing September 25, 2026. [Doc. No. 52.]

7

Meanwhile, Mr. Russell failed to appear at the third attempt to hold a 341 meeting in mid-September. [Doc. No. 61.] The day before the hearing scheduled on the Verified Claim, Mr. Russell filed a document called Notice of Lodgment and Filing of Trust Instruments [Doc. No. 62] (the "Trust Documents"). This filing is inscrutable and smacks of various sovereign citizen-type theories. While the documents are incomprehensible in many respects, they evidence a frivolous attempt to remove assets from the bankruptcy estate or otherwise assert that the Court lacks jurisdiction over Mr. Russell and his assets. Mr. Russell failed to appear at the hearing on September 25, and the Court denied the Verified Claim for want of prosecution. [Doc. No. 69.] Mr. Russell later withdrew the Trust Documents. [*See* Doc. No. 92.]

In mid-October, Mr. Russell filed a document called Verified Notice of Repentance in Equity. [Doc. No. 66.] This document attempts to explain why Mr. Russell failed to appear at previous hearings. The document states, among other things, that Mr. Russell stands strictly in equity, that he never consented to debtor status, that he filed a Verified Notice of Non-Appearance earlier in the case to preserve standing, that his non-appearance was strategic and not an abandonment of claims, and that the notice "be received as a cleansing of the record and affirmation of standing." [*Id.*] The Court found no valid claim for relief in this document and took no action on it.

A week later, on October 21, 2025, Mr. Russell filed three more documents: Verified Notice of Trustee's Lack of Equitable Authority [Doc. No. 72]; Verified

Declaration of Special Appearance [Doc. No. 73]; and Verification Under Oath [Doc. No. 74]. These documents assert, in various ways, that Mr. Russell does not consent to jurisdiction, that he appears only in equity, and makes various arguments that Trustee has no authority. Again, the Court found no valid claim for relief in these documents and took no action on them. Mr. Russell later withdrew all three documents. [Doc. No. 92.] Three days after filing the documents, Mr. Russell failed to appear at the fourth attempted 341 meeting on October 24, 2025. [Doc. No. 76.]

The docket was relatively quiet during November. The only document Mr. Russell filed was an opposition [Doc. No. 80] to Trustee's pending Motion for Order: (A) Compelling Debtor to Perform His Statutory Duties, and (B) Prohibiting Debtor from Removing Property of the Bankruptcy Estate. [Doc. No. 67.] Trustee's motion requested an order compelling Mr. Russell to appear at the 341 meeting and produce his most recent tax return, photo identification, and a copy of his social security card. It further stated Trustee had received no communication from Mr. Russell other than threats of sanctions. Mr. Russell's opposition, filed the day before the next-scheduled 341 meeting, asserted that Trustee's motion was premature because Mr. Russell would appear at the next 341 meeting. [Doc. No. 80.] It further stated that Mr. Russell provided the requested documents to Trustee, rendering the motion to compel moot. [*Id.*] The next day, Mr. Russell finally appeared at the 341 meeting, but he appeared

9

by phone and without the ability to appear by video.[6] Trustee rescheduled the 341 meeting again. [*See* numberless docket entry between Doc. Nos. 80 and 81.]

### F. The Turnover Motion and Motion to Convert

A few days after the fifth attempted 341 meeting, Mr. Russell filed his Motion to Compel Turnover of Exempt Funds [Doc. No. 82] (the "Turnover Motion"). The Turnover Motion requested an order compelling Trustee to turnover a total of $35,319.82 in the frozen bank accounts, which Mr. Russell continues to assert are exempt federal benefits pursuant to 42 U.S.C. § 407(a), 38 U.S.C. § 5301(a), and 10 U.S.C. § 1440. The Turnover Motion incorrectly argued that Trustee's deadline to object to his exemptions had expired, making his claimed exemptions final and binding.[7] The Court scheduled a hearing on the Turnover Motion for December 18, 2025. [Doc. No. 83.]

On December 4, 2025, Mr. Russell filed the Motion to Convert addressed in this Opinion. The Court scheduled it to be heard along with the Turnover Motion on December 18. [Doc. No. 89.]

Mr. Russell finally appeared at the December 18 hearing, and it appeared the case might be getting back on track. Two days before the hearing Mr. Russell withdrew most of his most perplexing filings. [Doc. No. 92.] At the hearing, Mr.

---

[6] 341 meetings have been conducted remotely in this district since the onset of the COVID-19 pandemic, but debtors must appear by video.

[7] Trustee's deadline to object to exemptions runs from the date the 341 meeting is concluded. *See* Fed. R. Bankr. P. 4003(b)(1). Because Mr. Russell repeatedly failed to appear at the 341 meeting, the 341 meeting had not concluded as of the date Mr. Russell filed the Turnover Motion.

Russell stated he had received bad advice from a family member, and that was why he failed to appear at previous hearings and 341 meetings. [Doc. No. 145, Dec. 18 Tr. 14:20-22]. Mr. Russell asked that his case be converted to 13 as a matter of right to save his home from foreclosure and stated that the money in the bank accounts is from federal benefit payments that are exempt. Trustee and counsel for the United States Trustee both argued that Mr. Russell was not complying with his duties as a debtor in good faith and that the Court should wait until at least the conclusion of the 341 meeting to consider converting the case.

Trustee also argued that the Turnover Motion was improper because (1) he did not have the funds—the banks held the funds—and (2) it was premature to order turnover of the funds because the deadline to object to the claimed exemptions had not expired. [*Id.* at 6:11-19.] Trustee further stated that he believed some funds in the bank accounts might be from nonexempt sources and that Mr. Russell must provide him with information to verify the source of the funds before Trustee could agree the funds are exempt. [*Id.* at 6:24-25.] The Court agreed with Trustee and ruled that it would deny the Turnover Motion. The Court also agreed with Trustee and the United States Trustee that Mr. Russell should, at a minimum, appear at the 341 meeting (scheduled for the following day) before the Court ruled on the Motion to Convert. [*Id.* at 16:2-18:19.] The Court continued the Motion to Convert to February 26, 2026.[8]

---

[8] The Court initially rescheduled the hearing to Feb. 5, but it was reset to Feb. 26 because Mr. Russell could not attend the Feb. 5 hearing for reasons beyond his control.

### G. The 2004 Exam

The Court also discussed with Mr. Russell the fact that, prior to the December 18 hearing, the United States Trustee obtained an order to conduct a 2004 examination of Mr. Russell on January 12, 2026. [Doc. No. 91.][9] Counsel for the United States Trustee stated that he was willing to conduct the examination on a more convenient date for Mr. Russell prior to the continued hearing and that he would email Mr. Russell to coordinate, but if no other date could be agreed upon then it would expect the examination to go forward on January 12. [Dec. 18 Tr. 23:3-17.] The Court informed Mr. Russell that it expected him to appear for a 2004 examination before the continued hearing on his Motion to Convert. [*Id.* at 20:17-20.]

### H. The Property and Adversary Proceeding

Another issue discussed at the December 18 hearing was Mr. Russell's home and his mortgage lender's request for relief from the automatic stay. Although most of the above discussion and the filings in the case relate to the bank accounts and the exemption issue, the real driving force behind this case is Mr. Russell's residence located at 3281 Wolf Club Ln. SW, Atlanta, GA 30349 (the "Property"). Servbank, N.A. asserts a lien on the Property and filed a motion for stay relief early in the case

---

[9] The United States Trustee filed a motion for 2004 examination November 26, 2025. [Doc. No. 85.] That motion states that Mr. Russell timely responded to an initial inquiry by the United States Trustee requesting various documents such as bank statements, benefits letters, and mortgage information, but that it believed a 2004 examination was necessary. The United States Trustee made an informal request to Mr. Russell for a 2004 examination in August, but instead of responding Mr. Russell filed his Verified Objection and Notice of Non-Consent to Rule 2004 Examination [Doc. No. 35], in which he stated he would not appear at any 2004 examination. Mr. Russell, however, did not object to the United States Trustee's motion for 2004 examination, and the Verified Objection provides no legitimate basis to deny a request for a 2004 examination.

12

seeking to foreclosure on the Property. [Doc. No. 49.] Servbank asserts the balance of the mortgage as of August 12, 2025, was $356,902.46 with a past due amount of $78,260.68. [*Id.*] Monthly payments are $2,607.27, meaning the delinquency covers approximately 30 monthly payments. Despite that large arrearage, the Property appears to have substantial equity, as Mr. Russell scheduled the value of the Property at $550,500, which no one has disputed. Indeed, Trustee asserts substantial equity exists in the Property available to pay creditors, and, if the case is not converted to chapter 13, he intends to market the Property for sale to pay creditors. Trustee requested a reset of the stay relief motion several times until Servbank ultimately withdrew the stay relief motion. [Doc. No. 122.]

Mr. Russell also filed an adversary proceeding, AP No. 25-5201 (the "Adversary") against both Servbank and Trustee. The complaint is filed in the name of "Your Orator, Irving Russell Bankruptcy Estate 25-56553-JWC Trust by and through its Absolute Trustee,[10] Irving Russell." [AP Doc. No. 1.] The complaint attaches several documents with post-petition dates that appear to be additional attempts by Mr. Russell to transfer assets out of the bankruptcy estate into a trust he controls without authority or relief from the Court. [*Id.*]

Substantively, the Adversary complaint asserts various claims against Servbank related to the promissory note and security deed on Mr. Russell's Property,

---

[10] The document includes a footnote that "Absolute Trustee is used in its equitable sense, signifying one who holds the confidence and duty of administration under a private, non-statutory, non-commercial trust created in equity. Such trustee derives authority not from statute or registration, but from the act of private conveyance and the conscience of the trust relationship itself."

arguing that assignments of the security deed are invalid, demanding production of the original documents, removing a cloud upon title, and enjoining foreclosure efforts. [*Id.*] Trustee filed a motion to dismiss the complaint against him because it asserts no claims against him, which the Court granted without response by Mr. Russell. [AP Docs. No. 7 and 8.] Servbank also filed a motion to dismiss asserting the claims have no legal merit and, even if they did, they belong to Trustee. [AP Doc. No. 11.] Mr. Russell has not filed a response to that motion, and the response deadline has long passed, but the Court has not ruled on that motion.

## I.  Appeals, Exemption Objection, and February Hearing

Back to the main bankruptcy case, the day after the December 18 hearing, Mr. Russell finally appeared and answered questions at the 341 meeting. Trustee filed a report of assets two days later and requested a bar date for filing proofs of claims. [Doc. No. 95.] At the end of December, the Court entered an order denying the Turnover Motion for the reasons stated on the record at the December 18 hearing. [Doc. No. 96.] Mr. Russell filed a notice of interlocutory appeal and motion for leave to appeal that order. [Doc. Nos. 105 and 106.] The motion for leave to appeal is pending in the district court.

Trustee timely filed an Objection to Claimed Exemptions on January 14, 2026 (the "Exemption Objection"). [Doc. No. 111.] Trustee objects to Mr. Russell's claimed exemptions in the bank accounts.[11] Trustee argues that it is Mr. Russell's burden to

---

[11] Trustee also objects to Mr. Russell's claimed homestead exemption in the full value of the Property because Georgia's homestead exemption statute currently limits the exemption to $21,500, O.C.G.A. § 44-13-100(a)(1), and the equity value of the Property appears to greatly

14

trace the funds in the bank accounts to show they come from exempt sources, and to date he has produced only a few redacted bank statements that do not demonstrate the source of the funds in the accounts. The objection also states that Mr. Russell testified at his 341 meeting that money in the Wells Fargo account comes from his employment income, not any exempt federal benefits. [*Id.*]

Trustee filed a response in opposition to the Motion to Convert. [Doc. No. 120.] Less than an hour before the hearing on February 26, Mr. Russell filed a reply in support of his Motion to Convert and amended Schedules I and J. [Doc. No. 134.]

At the hearing, Mr. Russell reiterated that he had the income to pay his debts, he stated he had documents to support his numbers, and his past cases were not dismissed based on an inability to pay. He stated he was simply trying to save his home and pay his debts, and he asked for the opportunity to do that. [Doc. No. 146, Feb. 26 Tr. 4:3-7:24.] Trustee argued that his opposition to conversion was not whether Mr. Russell could pay his debts but whether he will. [*Id.* at 13:7-10.] Counsel for the United States Trustee stated that following the previous hearing, he emailed Mr. Russell about scheduling the 2004 exam and followed up several times, but Mr. Russell never responded and failed to appear for the 2004 exam on January 12. [*Id.* at 17:22-19:9.] Counsel argued that the Court should take into consideration Mr. Russell's willingness to work with a chapter 13 trustee in deciding whether to convert the case. [*Id.* at 19:9-23.] Mr. Russell gave no explanation for failing to respond to

---

exceed $21,500. Mr. Russell does not challenge Trustee's objection to the homestead exemption.

15

counsel for the United States Trustee or appear for the 2004 exam and stated he took responsibility for that failure. [*Id.* at 21:6-12.]

The Court then turned to the Exemption Objection. Although there was significant discussion on the issue, the end result was that Mr. Russell agreed to produce additional bank statements to Trustee to show the funds in the bank accounts were from exempt sources, [*Id.* at 33:14-21; 43:3-5], and the Court continued both matters to April 2, 2026, with the expectation that Mr. Russell would provide the necessary bank statements to Trustee. [*Id.* at 44:7-12.]

As of the continued hearing on April 2, however, Mr. Russell had produced no additional bank statements, which Trustee argued was further evidence that conversion would be futile based on Mr. Russell's bad faith. [Doc. No. 147, Apr. 2 Tr. 2:24-3:5.] Mr. Russell stated that he could not obtain bank statements going back more than 7 years, and because Trustee had requested bank statements from the last date the accounts had a $0 balance, which was more than 7 years ago, he did not produce any. He stated that he had produced 6 months of bank statements, it was Trustee's burden to establish the exemption was not proper, and it was not reasonable for him to produce bank statements for 7 years.[12] [*Id.* at 3:8-4:24.]

With no apparent resolution of the Exemption Objection, the Court took both the Motion to Convert and the Exemption Objection under advisement. This Opinion

---

[12] Trustee did not request 7 years of bank statements. He requested bank statements from the date the bank accounts had $0 balances. According to Mr. Russell that date was more than 7 years ago. The Court can infer that Mr. Russell must have additional statements available to him if he knows they have not had $0 balances for 7 years, but no one else can verify that information because he refuses to produce the statements.

addresses only the Motion to Convert. The Court will address the Exemption Objection separately.

**CONCLUSIONS OF LAW**

"The debtor may convert a case under [chapter 7] to a case under chapter . . . 13 of this title at any time, if the case has not been converted [from chapter 11, 12, or 13.] 11 U.S.C. § 706(a). Further, a case cannot be converted to another chapter of the Bankruptcy Code "unless the debtor may be a debtor under such chapter." *Id.* at § 706(d). In *Marrama*, the Supreme Court held that a court may deny a debtor's request to convert a case from Chapter 7 to Chapter 13 where "cause" exists under § 1307(c) to dismiss the case or convert it back to chapter 7. 549 U.S. at 373. The *Marrama* Court ruled that the debtor's bad faith is cause under § 1307(c) and allows a court to deny a motion to convert. 549 U.S. at 374-75. *Marrama* did not attempt to "articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7." 549 U.S. at 375, n. 11. However, the *Marrama* court remarked,

> It suffices to emphasize that the debtor's conduct must, in fact, be atypical. Limiting dismissal or denial of conversion to extraordinary cases is particularly appropriate in light of the fact that lack of good faith in proposing a Chapter 13 plan is an express statutory ground for denying plan confirmation.

*Id.* Following *Marrama* courts often list a variety of factors to consider when deciding a motion to convert from chapter 7 to chapter 13, but all seem to agree that the

17

analysis is fact-specific and looks to the totality of the circumstances, with denial

being limited to egregious cases.[13]

The Court concludes that Mr. Russell's conduct in this case easily fits the

description of atypical, extraordinary, and egregious for purposes of finding bad faith.

Initially, Mr. Russell failed to disclose a bank account holding approximately $30,000.

Mr. Russell asserts that his failure to disclose that account was an error based on his

belief that the funds were exempt and not property of the estate. The Court does not

accept that explanation. Mr. Russell disclosed numerous assets, including his

residence, that he claimed to be fully exempt. He also disclosed three bank accounts

containing approximately $5,000 that he asserts are exempt on the same basis as the

account containing $30,000. Mr. Russell amended his Schedules only after he failed

---

[13] Although the Court is not aware of any specific test adopted by the Eleventh Circuit for motions to convert from chapter 7 to 13, the Eleventh Circuit generally applies a totality of the circumstances test to questions of bad faith or lack of good faith in bankruptcy. *See, e.g., In re Kitchens*, 702 F.2d 885, 888 (11th Cir. 1983) (endorsing 11 non-exclusive factors to question of whether chapter 13 plan proposed in good faith); *Brown v. Gore (In re Brown)*, 742 F.3d 1309, 1317 (11th Cir. 2014) (*Kitchens* test is "basically. . . a 'totality of the circumstances' approach for determining good faith or lack thereof."); *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253, 1271 (11th Cir. 2014) ("Bad faith does not lend itself to a strict formula" and "totality-of-the-circumstances approach is the correct legal standard for determining bad faith under 707(a)"). Other courts addressing motions to convert likewise focus on the totality of the circumstances and find no single factor or list of factors to be dispositive. *See, e.g., Silver v. PHH Mortgage Corp. (In re Silver)*, BAP No. CC-22-1101-LFT, 2022 WL 17848965 *4 (B.A.P. 9th Cir. Dec. 19, 2022) (listing factors to consider but finding "[t]hese factors are 'simply factors to consider[,]' and 'not every one of them must be met. . . . [W]hat matters is the totality of the circumstances.'" (citing *Khan v. Barton (In re Khan)*, 846 F.3d 1058, 1065 (9th Cir. 2017))); *Woodbury v. Vara (In re Woodbury)*, No. 20-1612, 2021 WL 2660488 *2 (6th Cir. March 18, 2021) ("In deciding a motion to convert, the bankruptcy courts . . . look to the 'totality of the circumstances.' . . . [G]ood faith is a fact-specific and flexible determination." (citations omitted)); *In re Johnson*, 634 B.R. 806, 817-18 (Bankr. D. Colo. 2021) (applying totality of circumstances and listing factors to consider); *Culp v. Stanziale (In re Culp)*, 545 B.R. 827, 841 (D. Del. 2016) (applying totality of the circumstances and listing factors to consider).

18

to appear at the 341 meeting and Trustee discovered the undisclosed account and froze the funds. As the *Marrama* decision observes, "there is no 'Oops' defense to the concealment of assets, 549 U.S. at 370 (citing bankruptcy court opinion), and Mr. Russell's proffered explanation for failing to disclose the account defies belief. The Court could find that the failure to disclose the $30,000, by itself, is sufficient to find bad faith. But Mr. Russell's bad faith conduct goes far beyond his failure to disclose the bank account.

Mr. Russell's conduct establishes a clear and egregious pattern of delay and disruptive behavior. *See In re Landry*, Case No. 18-55697-LRC 2019 WL 2386109 *2 (Bankr. N.D. Ga. June 4, 2019) ("Bankruptcy courts have found that denying conversion due to a lack of good faith is appropriate when there is a clear record of delay or disruptive behavior. . . . Such conduct may involve filing duplicative and frivolous filings."). He failed to appear at four 341 meetings, improperly appeared by phone at a fifth 341 meeting, and failed to appear at two scheduled hearings on his own motions while simultaneously threatening Trustee with sanctions, filing document after document asserting frivolous theories that the Bankruptcy Code and Rules do not apply to him, and executing numerous documents attempting to transfer bankruptcy estate assets to himself. His explanations for these numerous failures and frivolous filings, to the extent he has given any, are strategy and bad advice. It is clear to the Court that the only reason Mr. Russell finally appeared at the 341 meeting and began to behave somewhat reasonably is because he could not obtain a release of the $30,000 through threats to Trustee and repetitive frivolous filings.

Even after Mr. Russell withdrew some of his more troubling filings, appeared at the December 18 hearing, and attended the 341 meeting on December 19, Mr. Russell failed to respond to counsel for the United States Trustee's efforts to coordinate a convenient time to conduct a 2004 exam and then failed to appear at the Court-ordered 2004 exam. The Court finds this failure particularly troubling given that the Court ordered him to appear at the 2004 exam and specifically instructed him at the December 18 hearing that it expected him to appear at the 2004 exam. Mr. Russell has never offered any explanation for his failure to appear at the 2004 exam, stating only that he takes responsibility for it. But he essentially asks the Court not to hold him responsible for it, or any of his previous actions in this case.

Mr. Russell's conduct with respect to the exemption of funds in the bank account further demonstrates bad faith. 11 U.S.C. § 521(a)(3) requires debtors to "cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title." Mr. Russell has done the opposite. Although Mr. Russell might ultimately be correct that at least some of the funds in the accounts are exempt, he has steadfastly refused to cooperate with the Trustee to provide information to allow Trustee to determine whether the claimed exemption is appropriate. Mr. Russell's actions do not show a debtor acting in good faith to cooperate with Trustee, but rather a debtor determined to make Trustee's job as difficult as possible. The Court has no reason to believe such conduct would not continue in a chapter 13 case with Mr. Russell's interactions with a chapter 13 trustee.

Mr. Russell's conduct and numerous filings in this case leave no doubt that he has no respect for the Bankruptcy Code or Rules, Trustee, the United States Trustee, or the Court. Mr. Russell clearly believes that the rules do not apply to him, and he has no intention of complying with his obligations as a debtor in good faith. Accordingly, the Court finds this case is the extraordinary case in which a debtor's conduct establishes bad faith sufficient to deny a motion to convert to chapter 13.

**IT IS ORDERED** that the Motion to Convert is **DENIED**.

The Clerk's Office is directed to serve a copy of this Order upon Debtor, the chapter 7 trustee, and the United States Trustee.

**END OF DOCUMENT**
